I represent Rebecca Reinertson and this is another social security disability case. It's undisputed that Rebecca suffers from fibromyalgia. Fibromyalgia is a condition that was recently considered in the Ninth Circuit case of Beneke v. Barnhart in August of last year. The Court recognized that it's a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, and ligaments. Recognized symptoms of fibromyalgia include chronic pain throughout the body with multiple tender points, severe fatigue, and a pattern of sleep disturbance that exacerbates the pain and the fatigue. Rebecca has all of these symptoms. It's unknown what causes fibromyalgia, although sometimes it occurs after a traumatic injury, and that's what happened in her case. She was in a motor vehicle accident in October of 1997. She didn't break any bones, so they figured that her pain would go away. When it didn't go away, she aggressively sought medical assistance. She saw seven different specialists over the next several months and remarkably continued working during this period. In February of 98, on the advice of Dr. Carl, she cut her hours back to half time. The pain still didn't go away. She was in another motor vehicle accident in July of 98, and finally in September she had to quit working. Her alleged onset date for purposes of disability is September 18, 1998. After she stopped working, she continued to see doctors, and in March of 1999 she hooked up with Dr. Paul Brown. Now, he's a rheumatologist that specializes in the treatment of fibromyalgia. Dr. Brown's opinion is that his patient's pain and fatigue is so severe that she could not sustain work activity. In fact, his opinion was that if she tried to work, it would make her symptoms worse. The administrative law judge recognized that Dr. Brown had provided this opinion, but rejected it. And the reason he rejected it is the primary issue in this case. The administrative law judge noted that Dr. Brown's opinion conflicted with the opinions of Dr. Birkland and Dr. Roden. These are two orthopedists who examined Rebecca once each in March of 1998. This was six months prior to her alleged onset date, at a time when she was still working. We contend that their opinions cannot be used to discredit Dr. Brown's opinion of disability. Dr. Brown is a treating specialist. Dr. Birkland and Dr. Roden are also specialists. But their specialty is orthopedics. They examined Rebecca and determined that there was nothing wrong with her bones. Therefore, she was exaggerating her pain symptoms. Well, it turns out that her pain was caused by a rheumatic disorder, not by an orthopedic problem. Also, the fact that their opinions were rendered six months prior to her alleged onset date, when she was still working, is not, I understand, irrelevant. She's not claiming that she couldn't work in March of 1998. She's claiming that she couldn't work starting in September of 1998. The Federal District Court affirmed the administrative law judge's decision based on these opinions of the orthopedist. Is this an ALJ who sort of doesn't believe in fibromyalgia? I know there are still people out there who have the belief system. Yes, I believe he does. I believe he is. And the reason I believe that is because of something he wrote in his decision. When he was talking about Rebecca's credibility, he said he didn't believe her because her pain was allegedly from a nebulous diagnosis. We're at what page of the search? Let me see. That was at excerpt page 152. The ALJ wrote that this was a rather nebulous diagnosis, unsupported by objective medical evidence. Now, as noted in Beneke, there is no objective evidence to make a diagnosis of fibromyalgia. There is no other evidence in the file after the election onset date that would support the administrative law judge's rejection of the treating specialist's opinion or of the testimony of the lay witnesses or Rebecca's own testimony. Another interesting issue in this case is whether or not the case should be remanded for another hearing or for immediate payment of benefits. We contend that, based on Beneke and also on another recent case, Moyza v. Bardhart, which came down in April of last year, that a remand for payment of benefits would be appropriate in this case. The record is fully developed. Not only do we have the medical evidence and testimonial evidence, but we also have vocational evidence in this file. The judge chose not to have a vocational expert at the hearing, but there is a 34-page vocational report by Donald Usland. Mr. Usland established that not only can Rebecca not return to her past relevant work and sustain it even on a part-time basis, but that no employer would accommodate her particular limitations. So we would request that you reverse the ALJ's decision and remand the case for payment of benefits. And if you don't have any questions, I'd like to reserve my remaining time. Good morning, Your Honors. May it please the Court. David Bloom for the Commissioner. The first problem with plaintiff's argument is that diagnosis of fibromyalgia does not equate to a finding of disability. And Dr. Brown's opinion seems to do just that. In page 109 of the excerpts of record, he talks about fibromyalgia kind of generally and the limitations it can cause. And the implication, which he applies to this case, is that people who have fibromyalgia are disabled. That doesn't necessarily need to be true, particularly in this case where we have the claimant who was 31 years old at the time of the ALJ's decision. And although she does claim that she was in two automobile accidents, and we acknowledge that, I'd like to point out that the first one was a collision that involved her being stationary in her car, a van backed into her going less than 10 miles per hour. She says 5 to 10 miles per hour. That's at pages 2 and 8 of the excerpts of record. The second one was in July 1998. Again, she was stationary in her car. This time, a car rear-ended her going less than 5 miles per hour. And then she says that a few months after that, at age 29, I believe, in September 1998, she's totally and permanently disabled. What's unusual about this case, and is different from Beneke, is that at step 4, a claimant is not disabled if she retains the ability to drive. Here, she had part-time past relevant work. There are three main requirements for past relevant work. One is that you perform it within the past 15 years. That's clearly met here, because she performed the part-time financial services job as recently as September 1998, just before she became disabled. The second requirement is that you perform the job long enough to learn how to do it. She met that as well, not only had she performed it part-time for most of 1998, but she had performed it full-time for two years before that. And the third and final requirement for past relevant work is that it be substantial gainful activity. And substantial gainful activity can be part-time. The Regulation 404-1574, 404-1560, excuse me, 404-1570, says that you can perform substantial gainful activity. Yes. So there's one aspect of the ALJ's opinion that gives me some pause, and I wonder if you could help me out. One of the things that the ALJ says that's inaccurate is at least once or twice he refers to two children, whereas she had only one. And he also says that she cares for her child. In that case, he had it correct. She is sufficiently active to care alone for a small child, which is no small job in itself. And I agree that it's no small job to care for a child, but her actual testimony was, I have a lot of help from my parents. I also have him in a co-op preschool with other mothers involved. And then she goes on to say that her dad isn't working, so he's helping her out about four days a week, plus she has this preschool. So it's clear that she isn't caring alone for a child, let alone two children. So it seems like the ALJ is way overstating her actual daily activities. I acknowledge, though, he does rely on some other things to deal with the credibility question as well. What do we make, though, of this factual inaccuracy? What effect does that have? Well, two things. One is that you just alluded to, he gave other reasons as well. And that's in the court noted that as long as one or more of an ALJ's reasons support credibility finding, it's harmless error that one might not hold up. But here, I think the activities of daily living and the child care still holds, even though the ALJ inadvertently doubled the size of her family by giving her another child. And doubled the amount of time that she spends taking care of the child. Yes, but I think it comes back to part-time work. The ALJ found that she could go back to either her full-time or part-time job. The district court affirmed solely on the part-time ability. And that's all you're arguing for here. That's sufficient. And even though she had a great deal of help caring for her child, she testified that she worked part-time two to three days a week, four hours a day. It just so happens that even taking the minimum of that, two days a week, four hours a day, eight hours a week, at her salary that she earned at the job with the State, that qualifies as substantial gainful activities, eight hours a week. And even if she gets a good deal of help caring for her child, describing the record as an active 3-year-old, I submit that she cared for her child alone at least eight hours a week. Are you saying that the judge, as a matter of law, would have had to find that even if the judge didn't understand what she was actually doing? Well, as a matter of law, at step four, the burden of proof, burden of persuasion is always on the claimant. And the burden of proof is on the claimant to show that she was unable to return to her previous part-time job working as little as eight hours a week. She didn't show that. Not only with the evidence regarding her taking care of her child, at least some of the time, enough to give rise to the conclusion that she retained the ability to work four hours a day at a sedentary, largely sedentary job, which is the way she described her job with the State. But there's also the issue of what Dr. Brooklyn found that plaintiff's counsel alluded to earlier, and that is the possibility of malingering. I wouldn't dismiss it as quickly as plaintiff's counsel did in her argument. It's true that maybe physical findings could go stale after a period of months, but malingering is a different matter. Dr. Brooklyn was an orthopedic doctor, but that doesn't mean he doesn't have any knowledge about fibromyalgia. In fact, he talked about fibromyalgia in his opinion and said that at that time plaintiff didn't have it. He was aware of it. He's qualified to deal with that impairment as well. And even if someone has fibromyalgia, Dr. Brooklyn noted that plaintiff during examination was displaying extreme discomfort even at light touches, indicating some kind of what he called exaggerated pain behavior and symptom magnification. Dr. Rodin, Dr. Rodin, however you pronounce it, also found that he noted that plaintiff had positive Waddell signs, which this Court in Ostenbrock also noted can support an adverse credibility finding. ALJ also alluded to the possibility of secondary gain, which is an element of malingering. It's a rational interpretation of the evidence given Dr. Brooklyn's statement and given that she sought litigation and settlement from those two admittedly minor automobile accidents. In fact, the second one that was less than five miles per hour generated a settlement of $25,000 as of page 123 of the record. Also, even if you take plaintiff's testimony at her word, she said that she had good days and bad days and that she had down days, as she put it, three to four days a week. That's in her hearing testimony. And even if you allow that, that would still leave her capable of performing her previous part-time job two days a week, four hours a day, which is enough. I mean, at Step 4, it is kind of an unusual, unusual approach to find that someone is not disabled being able to work only eight hours a day. But at Steps 1 and at Steps 4, the focus is on substantial gainful activity, and we don't focus as much on the number of hours that someone works. I don't have anything else, unless Your Honors want to ask any questions. I don't have any further questions. Thank you. Thank you. Whether or not Rebecca's work at the end was part-time or full-time is really a red herring in this case. Rebecca could not perform any work at all. She did everything she could to continue working. She loved working. She cut her hours to half-time and took a pay cut. Her employer provided accommodations for her. She worked at home. This was in her testimony. She worked at home some days. She came in at different hours. She did everything she could do to continue working, but it just got to be too difficult for her. So, and her treating specialist, his opinion was that she could not do any work at all. He didn't differentiate between part-time or full-time. Dr. Brown wrote that work activity would exacerbate her symptoms and make them worse. I'm rather upset with the council's use of the word malingering. Malingering is kind of a flashpoint in a social security disability case. The administrative law judge never used the word malingering. He did not accuse her of being a malinger. He talked about exaggerated pain symptoms, but malingering is a --" Secondary gain. Secondary gain, yes, which is an interesting argument. What does secondary gain mean? I'm not sure. Nobody who applies for social security disability or L&I benefits or anything does so without expecting to get some amount of gain from it. That's why you apply for a program. The secondary gain analysis just doesn't make much sense. Also, the judge used, or the administrative law judge used the secondary gain argument to dismiss the testimony of Rebecca's mother, who sees her several times a week, and Rebecca's former supervisor, who saw her decline in the workplace. The secondary gain argument makes even less sense when you apply it to lay witnesses. The --" We contend that Rebecca did meet her burden of proof at Step 4. There's medical evidence. There's treating specialist opinion, which is the best medical evidence. Excuse me. Let me just ask you one question. As a --" I understand you're arguing about the facts and the interpretation of the facts, but are you arguing that part-time work of this kind could not be substantial gainful activity, or are you just arguing the facts? In other words, are you saying it's a part-time job of this kind sufficient if she could do it? And I understand you don't concede she could do it, but that's not an issue then in the case, or is it? No. It's not an issue in this case simply because she couldn't even do part-time work. However, I imagine there would be part-time jobs that could be past relevant work as defined by the regulations. Interestingly, in this case --" No. Let me pinpoint it here. If, in fact, she could perform what she used to do, the half-time, four hours a day, two to three times a week, if, in fact, she could do that, is that sufficient to preclude her disability claim? Yes. If it's a job that's available on a half-time basis, yes, I believe it could be. So we're talking facts and not legal standards, basically. Yes, and to my knowledge, this job isn't available part-time, and the only reason she did it part-time was because she'd done it full-time so well for six years before she was accommodated. This was an accommodation by the employer. Thank you. The case just argued is submitted. We'll hear the next case, which is Pocatello Education Association v. Azura, and then we will take a break after the next case.
judges: Schroeder, Goodwin, Graber